[Civil No. 2121.   Filed February 17, 1925.]

[233 Pac. 595.]

GAZETTE PRINTING AND PUBLISHING COMPANY, a Corporation, also Known as GAZETTE PRINTING COMPANY, Appellant, v. SAMUEL SUITS, Appellee.

1. MASTER AND SERVANT—COMMON-LAW DEFENSES EXCEPT NEGLIGENCE OF EMPLOYEE ABROGATED BY EMPLOYERS' LIABILITY LAW.—Under Employers' Liability Law, every common-law defense, except negligence of employee as proximate cause, is abrogated, being regarded as condition of hazardous occupation for which employer is liable.

2. MASTER AND SERVANT—COMMON-LAW RULE REQUIRING EMPLOYEE TO CHOOSE SAFE WAY HELD INAPPLICABLE UNDER EMPLOYERS' LIABILITY LAW.—In action under Employers' Liability Law, common-law rule that where there is safe and unsafe way to do work, employee must choose safe way or he will be negligent so as to bar recovery, *held* not to apply.

3. MASTER AND SERVANT—RULES, REGULATIONS OR INSTRUCTIONS AS TO DUTIES, HELD CONDITIONS OF EMPLOYEE'S OCCUPATION.—Under Employers' Liability Law, rules, regulations or instructions as to duties and restrictions, or lack thereof, are intended by legislature to be conditions of employee's occupation.

4. MASTER AND SERVANT—EMPLOYER HELD LIABLE UNDER EMPLOYERS' LIABILITY LAW FOR PRESSMAN'S INJURY, AS OCCURRING FROM MANNER OF CARRYING ON BUSINESS. — Where pressman's hand was crushed between rollers while attempting to adjust clip while cylin-

---

1. Constitutionality, application and effect of federal Employers' Liability Act, see notes in 47 L. R. A. (N. S.) 38; 48 L. R. A. (N. S.) 987; L. R. A. 1915C, 47.

Effect on common-law action of Employers' Liability Act, see note in 12 L. R. A. (N. S.) 1038.

ders were revolving under electric power, in the way he had been instructed by foreman, although there was safer method of turning cylinder over, injury *held* to have occurred from manner in which business was carried on, so as to render employer liable under Employers' Liability Law.

See (1) 26 Cyc., p. 1229. (2) 26 Cyc., p. 1258. (3) 26 Cyc., p. 1180. (4) 26 Cyc., p. 1258.

On rehearing of appeal from a judgment of the Superior Court of the County of Maricopa. R. C. Stanford, Judge. Former opinion overruled and judgment for plaintiff affirmed.

For former opinion, see 26 Ariz. 464, 226 Pac. 542.

Mr. Richard E. Sloan, Mr. C. R. Holton, Mr. Greig Scott and Messrs. Bullard & Jacobs, for Appellant.

Messrs. Jennings & Strouse, for Appellee.

ROSS, J.—This case is before us upon a rehearing. The former opinion of the court is reported in 26 Ariz. 464, 226 Pac. 542. This opinion is in lieu of that one, from which we adopt only the statement of the case and some of the observations as to the nature of the action. The part thereof adopted appears in quotations as follows:

"Plaintiff seeks to recover for injuries sustained while in the employ of defendant as its pressman in charge of its duplex tubular printing press. At the time the press was being operated by electric power, and he received his injuries in attempting to adjust a clip on a revolving cylinder while it was in motion, and in doing so his left hand got caught between two such cylinders and was very badly crushed and injured. He had been working for defendant about one year, the first eight or nine months exclusively as a stereotyper, and the last three or four months as a stereotyper and assistant to the foreman of the pressroom. He had been act-

ing as such assistant for the purpose of qualifying himself to do the foreman's work while the latter was on his vacation. The foreman left the latter part of July, 1921, leaving plaintiff in charge. Plaintiff was hurt on the morning of August 11, 1921, while acting as substitute foreman.

"The printing press has five decks or units; each deck or unit, as we understand it, consisting of two stereoplate cylinders and two impression cylinders. Stereoplates are put onto the cylinders daily to print defendant's paper. They are held or fastened to the cylinders by means of clips. In removing plates from the cylinders, which in this case was done each morning, the clips were supposed to readjust themselves automatically. When they did not do so, it was the duty of the person removing plates to place them in position so that when plates were next put on the cylinder the clips would catch them without any handling.

"Assisting plaintiff on the morning he was injured was Harry Feurriegel, who had been working as an assistant in the pressroom under Hansen for about a year and a half. One of his duties each morning was to remove the plates from the cylinders and to wipe and oil the press. Sometimes he would adjust the clips as he would remove the plates. He did not do so on the cylinder on which plaintiff was working. Just as plaintiff was in the act of putting a plate on cylinder, he discovered the clips were not in place, and it became necessary for him to use his hands in adjusting them; but before he could do so the cylinder had to be turned until the clip was on top of it, when he could reach in about his arm's length and adjust it. This had to be done to get the plates on the cylinder.

"There were two ways of turning the cylinder, both well known to plaintiff; one was by hand power, and the other by electric power. The former was accomplished by the use of an iron bar held in the hand, one end being inserted in holes in a wheel on a shaft that connected with the cylinder. There were six holes in the wheel. Sometimes it would be necessary to bar it two or three times to get the cylinder in position to adjust it. The hand power

was always used in putting plates on or taking them off cylinder, as while this was being done the cylinder had to be still. The other way of turning the cylinder was by the application of electric power, and it seems that both kinds of power, but generally electric, were used in making adjustments or corrections in the clips when they were out of place.

"Plaintiff was using the electric power on the occasion that he was hurt. His explanation we give in his own language: 'I had just throwed in this deck and turned the power on and was going to put my plate in, and I seen the cleats were not back, and I told the boy who was helping me, I said, "Harry, the clips are not back, start her up"; and he started her up, and I reached in to get them and was pulling them back. When I reached in to get them, I reached in and got ahold of them, and it comes right out. This morning it didn't pull; this first finger caught on it when I pulled; it didn't come; and when it didn't come the press was going on and ran into the other cylinder, and this finger went in there and took this hand in. The boys said he had shut the power off before I hollered and it coasted in with my hand. If he hadn't shut it off—it will coast from five to ten seconds the speed we were going; running faster than that, it will coast from twenty seconds to half a minute before it will stop, and so my hand went in, and he had to back it up for me to get my hand out.'

"It is not seriously disputed that Hansen, the regular foreman under whom plaintiff worked as an assistant the preceding three or four months before he was injured, had been doing the same thing in the same way that plaintiff was doing it when injured. On that point the plaintiff says: 'That was the way I had been shown to do it. Mr. Hansen, the foreman, gave me those instructions. He did that work exactly the same way I done it. I ran the press for him last night while he done it. I never observed Mr. Hansen before I got hurt use that bar, not to turn the press to get the cleats back. I never saw him use it since I got hurt.'

"Harry Feurriegel testified on that point as follows: 'In order to reach the clips, he reached his

hand in and pulled them back about the length of your arm. He [Hansen] did it all the time that way—the same way that Sam did it. My job was to turn on the power. I saw Chris Hansen do it pretty near every day. There was a bar there to put on the plates with. I have seen Chris Hansen use the bar to turn over the machine instead of the motor; to put on the plates you have to. I never saw him do it in pulling the cleats back.'

"The plaintiff, in the presence of the court and jury, showed what he was doing when hurt. Hansen, in testifying, stated: 'I saw Sam [plaintiff] show the jury where that cleat was. That is the way I do it. I do it at my own risk. I never told Sam Suits not to do it that way. My instructions was to the helper to do that. The helper should have done that, not Sam. He saw me do it the same way.' Again: 'I pull the clips occasionally now. I pull it back with my hand just part of the time. I did it when Mr. Suits was present while the machine was operated by electric power.' He also testified that he had 'cautioned plaintiff about the machine, to be very careful and not to get caught, and if anything happened to let the machine go, to keep from getting caught in it.'

"Plaintiff was an experienced stereotyper. According to his own testimony he put in five years as an apprentice and had been a journeyman for six years. He had been around printing presses eleven years, and had about five months' experience as a pressman, three or four months of which time he was learning the work under Hansen. His employment by the defendant was his first contact with a tubular press. The time required to learn the trade of a press foreman, according to the evidence, is five years. The plaintiff was twenty-six years old at the time of his injury.

"On cross-examination plaintiff admitted he knew the cylinders could be revolved by hand power; that he had seen it done and knew himself how to do it; that while the operation by hand power was not very quick, it was perfectly safe, because the cylinders were still as he would reach in to adjust the clips; that he had no assistant when using hand

power for such purpose, as he would turn cylinders to proper position and then, while they were still, adjust clips. On the other hand, he stated when electric power was used he had an assistant to handle the throttle, who started machinery as he directed and kept cylinders revolving while he reached in to pull back the clips, which consumed in all two or three or four seconds; that he could look right in and see clip and cylinder all the time, and that while he was holding clip his hand was caught between the cylinders.

"Defendant makes two assignments of error. The first is directed at the court's order refusing to grant its motion for an instructed verdict at the close of the case, and the other is the court's refusal to give a requested instruction.

"The action was brought under the Employers' Liability Law, c. 6, tit. 14, Civil Code 1913. The purpose of this law is to afford relief to employees who may suffer injury in certain named and defined hazardous occupations, when they do not themselves negligently cause the injury. Included in such occupations is work of the kind in which the plaintiff was engaged at the time he was injured. The statute, paragraph 3156, says:

" 'The occupations hereby declared and determined to be hazardous within the meaning of this chapter are as follows: . . .

" '(10) All work in mills, shops, works, yards, plants, and factories where steam, electricity, or any other mechanical power is used to operate machinery and appliances in and about such premises.'

"We would first direct attention to the fact that the right of action under this law is purely a creature of the statute, and that it has features that distinguish it from most, if not all, rights of action under other provisions of the law for injuries sustained by employees. The action is very different from the common-law action of negligence. The latter distinctly sounds in tort; whereas, the former has none of the elements of tort. In this action the plaintiff does not have to show that the proximate cause of his injury was the negligence of defendant, but

he must show that the proximate cause of his injury was not his own negligence. The employer's liability is not based, as it is at common law, upon any violation of duty owing to the employee from the employer. It is made to depend upon the relationship. Therefore the rules governing in an action for negligence are not controlling and very often are inapplicable and misleading. Under the common-law rule, the servant's right to recover damages from the master for personal injuries might be defeated on several grounds: (1) When it was caused by negligence or unskillfulness of a fellow servant; or (2) by his own negligence, in working under conditions known by him to be dangerous or where the danger was apparent, in which case it was said he assumed the risk; or (3) where the accident causing his injury was due to his own negligence, or to the combined negligence of the master and servant.

"Under the Employers' Liability Law, all the above defenses are abrogated except one: The negligence of the employee when it causes the accident is a perfect defense. Every other common-law defense is regarded as a condition of the hazardous occupation determined and declared to be such by the statute. Thus an incompetent or careless fellow servant and an unsafe place to work are conditions of such occupations, as indeed are all other defenses at common law except the one named."

In our former opinion, after making the above statement, we proceeded to dispose of the case upon principles applicable to a common-law action for damages for personal injuries, to wit: The rule that where there is a safe and unsafe way for the employee to do his work, and he does it the unsafe way and is injured, he may not recover. And we held that reasonable men could not under the evidence come to any other conclusion than that plaintiff's injury was caused by his own negligence. We have, upon a reconsideration, come to the conclusion that those rules do not control when applied to the

facts as they appear in this case, and we now give our reasons for so concluding.

In *Consolidated Arizona Smelting Co.* v. *Egich,* 22 Ariz. 543, 199 Pac. 132, we considered at length the nature and elements of the right of action under the Employers' Liability Law, and there said, among other things:

"The hazards to which the employee is exposed may be greatly minimized by introducing into the work, and for the employee's protection, the latest and most approved safety appliances and devices, or the hazards may be multiplied by 'slipshod' methods or indifferent attention by the employer to the safety of the employee. This contingency was doubtless in the minds of the lawmakers when they made the liability of the employer depend upon an injury or death 'caused by an accident due to a condition or conditions of the occupation,' rather than the lack of care or precaution to prevent accidents."

We also said:

"The condition or conditions that cause the accident resulting in injury or death . . . may arise from the manner in which the business is carried on."

As the common-law defenses, except the negligence of the plaintiff, are regarded as conditions of hazardous occupations, so we think rules, regulations or instructions as to duties and restrictions of an employee, or the lack of such in proper cases, were intended by the legislature to be a condition of the employee's occupation. In the Egich case, on that question, we said:

"While the law does not undertake to regulate the conditions of the occupations declared to be hazardous by requiring the use of safety appliances and devices, it does provide in paragraph 3157, Civil Code, that the employer 'shall by rules, regulations, or instructions, inform all employees in such occupations as to the duties and restrictions of their

employment, to the end of protecting the safety of employees in such employment.' These expressions are admonitions to the employer that the extent of his immunity from liability to the employee for injury or death depends upon a strict observance of the slogan 'safety first,' by the application to his business of every possible means to prevent accidents."

See, also, *Tom Reed Gold Mines Co.* v. *Morrison,* 26 Ariz. 281, 224 Pac. 822.

Under the rules announced in the Egich case, an employee may be guilty of common-law negligence and still recover, unless such negligence is the proximate cause of the accident in which he is injured; for instance, the negligence implied in the assumed risk doctrine of knowingly working in an unsafe place, or with unsafe tools furnished by the employer, or working with a fellow employee known to be incompetent. These hazards, under the Employers' Liability Law, the employee no longer assumes, they being conditions of the occupation against which the law protects him. The law reverses the common-law rule, and the burden of accidents arising by reason of such conditions in hazardous occupations are lifted from the employee and placed upon the employer and by him transmitted to the business.

The facts disclosed here show that the plaintiff was "injured from the manner in which the business is [was] carried on." It is not shown the defendant had or promulgated any rules or regulations or instructions for employees as provided by law, and the only information conveyed to plaintiff as to "duties and restrictions of his employment" was to operate the press cylinders by electric power when adjusting clips. The press foreman, Hansen, under the evidence was the defendant's vice-principal, and he at all times adjusted clips as plaintiff was doing it when he was hurt, and he also, if not by words

by action, instructed plaintiff to do it in that way. If, as we said in the Egich case, the business of the employer, even though he may supply the last word in perfection of equipment, or tools, is carried on in a "slipshod" way, and the employee is injured by reason thereof, it will be a charge against the employer.

Before the enactment of our liability law, and kindred legislation—such as the Workmen's Compensation Law—there had grown up a set of common-law rules governing claims for damages arising in industry, and a tendency to look to those rules for light in construing statutes creating this new right, while natural, often leads into error, and such was the result in our former opinion. The writer of that opinion, and of this one, then felt, and now feels, and this feeling no doubt entered into the former opinion, that the verdict and judgment were excessive for the character and extent of the injury suffered. The injury without question was a serious one—the loss of the thumb to the joint and four fingers to the knuckles of the left hand—and resulted in disabling the plaintiff to a considerable extent for the work of a stereotyper, or for any other kind of work. However, it confined him to the hospital only ten days, and three months thereafter he had resumed his position with the defendant at the same wages, and, although considerably handicapped, the evidence shows he was fairly efficient. Notwithstanding, the verdict and judgment were for $10,000. The defendant, however, has not complained on that account; it did not make the amount of the judgment a ground of its motion for a new trial, and has not assigned it as error on appeal, choosing rather to stand upon its contention that the court erred in refusing to grant its motion for an instructed ver-

dict, and its refusal to give an instruction which in effect told the jury to find for the defendant.

As we have seen, the defendant's position was not tenable on those grounds, and the judgment must be affirmed.

. McALISTER, C. J., and LOCKWOOD, J., concur.